IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**CANARY REED**                                                                 **PLAINTIFF**

V.                                    **4:24CV00554 JM**

**VISTA OUTDOORS INC.,**
**REMINGTON AMMUNITION, AND**
**REMINGTON ARMS COMPANY, INC.**                                  **DEFENDANTS**

### ORDER

Pending is Defendants' Motion for Summary Judgment. The motion has been fully briefed by both parties and is ripe for consideration.

I. <u>Facts</u>[1]

Plaintiff Canary Reed was hired by Defendant Remington Ammunition ("Remington") in May of 2021 as a technician in the Taper Line department. (Schmidt Decl., Dkt. No. 14-1). Remington produces a wide array of pioneering, sporting, and hunting ammunition at its facility in Lonoke, Arkansas, where Plaintiff was employed. *Id.* In December of 2021, Plaintiff was reassigned to the Rotary Cam department as a Body Form Technician. *Id.* There, Plaintiff operated heavy machinery used in the production of shotgun shells. (Pl. Dep., Dkt. No. 14-2,

---

[1] The Court has thoroughly read through the entire record in this case several times and has attempted to cite each fact to the record. This endeavor has been more difficult because Plaintiff has filed all of her exhibits, i.e, her deposition, Mr. Reichel's deposition, Mr. Yekel's deposition, policy statements, etc, as a single docket entry with no delineation between exhibits or citation to page number of the docket entry. Plaintiff's counsel should be on notice that the Court is not inclined to undertake this effort again in his cases. *See Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.") "Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments." *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006).

19:17-24). Among other responsibilities, Plaintiff's job duties in the Rotary Cam department included repairing the machines for which she was responsible, operating multiple machines at once, and segregating plastic cutoff rings for recycling. (Yekel Decl., Dkt No. 14-3). Plaintiff consistently received bonuses and pay raises as a Body Form Technician. (Schmidt Decl., Dkt. No. 14-1). Plaintiff reported to various supervisors through her employment, including Charles Carter, Jeremy Hendrix, Christopher Pence, Matthew Bubb and Conrad Yekel. (Pl. Dep., Dkt. No. 14-2, 23:23-25, 24:1-2, 23:5, 89:24-25, 173:9-11, 20:9-11). Yekel was Plaintiff's supervisor at the time she was terminated. *Id.* at 20:9-11.

      Plaintiff alleges that four of her former co-workers, John, Chris, Luke, and Floyd (the "co-workers"), engaged in discriminatory and sabotaging conduct. Specifically, Plaintiff alleges that these four co-workers, who are white males, discarded a cardboard tool she had crafted to guide her machine, made false or premature complaints about Plaintiff's timeliness, were standoffish and refused to communicate with her, incorrectly reported in the logbook that Plaintiff did not show up for her shift, turned off her machines before her shift began, blamed her for machine failures, and falsely accused her of failing to properly segregate colored rings for recycling. Plaintiff admits that she never heard anyone at Remington make a racial remark, but their actions made her believe they were racist. (Pl. Dep., Dkt. No. 14-4 at p. 16, 39:5-9).

      On April 8, 2023 Plaintiff attempted to send an email to the Senior Director of Human Resources Darnetha Elmore and Director of Operations Adam White complaining about her Co-workers' conduct toward her. Later, Plaintiff spoke to Elmore for approximately an hour detailing Ms. Elmore on Plaintiff's difficulties with her co-workers since she had been hired at Remington. (Pl. Dep., Dkt. No. 30 at 74:2-76:7). At that time, Plaintiff also found out that neither Elmore nor White received Plaintiff's email. *Id.* at p. 243-244, 76:24-77:6-4 and p. 208, 41:20-

42:1. Plaintiff does not remember whether she complained that her co-worker's conduct was based upon her race or gender. *Id.* at p. 243, 76:2-12.

Afterward, Plaintiff waited outside in the parking lot for Adam White. *Id.* at p. 247, 80:7-25. Plaintiff told White that her co-workers were falsely complaining that she was not getting to her workstation on time and that her supervisor, Yekel, asked her to start clocking in at the office and have the shift meeting with her co-workers there. *Id.* at p. 248, 81:1-18. Plaintiff told White she did not think it was fair that she was accommodating her co-workers in this way. *Id.* Plaintiff could not remember if she told White that she believed she was being treated differently based on her race or gender. *Id.* at p. 253-54, 86:21-87:9.

Plaintiff complained to Yekel and Christina Beaman, the first shift supervisor, during a conversation in each of their offices. She informed them that she felt like someone threw away her handmade cardboard guiding tool as a "racial move." ((Pl. Dep., Dkt. No. 30 at 58:5-6). She believed her co-workers threw it away because they knew it was hers, because her co-workers were white men, and because they did not communicate with her. *Id.* at p. 204, 37:20-38:12.

On October 12, 2023, Yekel counseled Plaintiff about two issues: an allegation that Plaintiff had failed to repair a machine during her October 4th shift and an allegation that Plaintiff failed to run the required number of machines during her October 11th shift. (Yekel Decl., Dkt. No. 14-6 at p. 4). In the Employee Counseling memo, Yekel noted that Plaintiff had admitted fault for the "smash"[2] on October 4th. (Emp. Memo, Dkt. 14-5). Regarding the October 11th incident, Yekel noted that Plaintiff came to his office complaining about another supervisor, Chris Pence, who had stressed the importance of 'keeping machines up and hitting our daily quotas. …' *Id.* He noted, "You stated that you were too busy running the three other machines

---

[2] A machine smashes when it breaks down and cannot be fixed quickly. (Pl. Dep., No. 30 at p. 238, 71:10-15).

3

that you had and those four thousand bodies that was [sic] recorded was all that you could do." *Id.* Yekel stated that failure to run six (6) machines and hit the daily production quota was against the Job Performance Policy on page 68 of the employee handbook. *Id.* Plaintiff refused to sign the counseling memo. *Id.*

On the same day, Yekel observed that Plaintiff had failed to properly segregate the plastic cutoff rings during her shift. (Yekel Decl., Dkt. No. 14-6 at p.4-5). Remington requires employees to keep plastic scraps referred to as "cutoff rings" segregated by color for recycling. Mixing plastic colors before recycling brings the plastic out of specification. Out-of-specification plastic must be discarded and cannot be recycled. Plaintiff did not deny that non-segregated rings were in the ring room during her shift. Plaintiff contends that the previous shift had left the basket of non-segregated cutoff rings, and she merely pushed them out of her way. (Pl. Dep., Dkt. No. 30 at p. 309-310, 142:17-143:6). It is unclear whether she told Yekel this at the time. *Id.* at p. 313, 146:12-15; Yekel Dep., Dkt. No. 30 at p. 99, 37:11-38:12, p. 104, 42:21-22.

During a discussion with Plaintiff in his office, Yekel witnessed Plaintiff speak to another supervisor, Travis Zeman, who was also in the office. (Yekel Decl., Dkt. No. 14-6). Yekel observed Plaintiff invade Zeman's personal space, yell at him, and announce that she refused to speak to him. *Id.* Plaintiff contends that Zeman interrupted her conversation with Yekel. (Pl. Dep., Dkt. No. 30 at p. 278-270, 111:24-112:19). Yekel asked Plaintiff to separate from Zeman and calm down. (Yekel Decl., Dkt. No. 14-6). Based upon these incidents, Yekel stated that he made the decision to terminate Plaintiff. *Id.*

Yekel discussed with Schmidt his recommendation to terminate Plaintiff's employment. Schmidt approved the termination and communicated his approval to Defendant's Human Resources Department. *Id.* On October 20, 2023, Schmidt informed Plaintiff by phone that her

employment was terminated. (Pl. Dep., Dkt. No. 30 at p. 231, 64:1-8).

 II. <u>Standard for Summary Judgment</u>

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, [to] point out to the District Court, that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent s burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted) brackets in original)). Only disputes over facts that may affect the

5

outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

### III. Analysis

Plaintiff alleges that the Defendant discriminated against her based on her race and gender, created a hostile work environment, and retaliated against her in violation of Title VII and the Arkansas Civil Rights Act.[3]

#### A. Discrimination

To establish a prima facie case of discrimination under the McDonnell Douglas framework, Plaintiff must show: (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023) (citing *Faulkner v. Douglas Cnty.*, 906 F.3d 728, 732 (8th Cir. 2018). At the inference-of-discrimination stage, "[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014)

If a prima facie case is established, a "burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff." *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir.2005). If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory reason was a mere pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A plaintiff seeking to survive an

---

[3] Arkansas Civil Rights Act claims are reviewed in the same manner as Title VII claims. *Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir. 2007).

employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination. *Johnson*, 424 F.3d at 811.

It is undisputed that Plaintiff has established the first and the third prongs of a prima facie case. She is an African American female, and she was terminated by the Defendant. Defendant argues that Plaintiff cannot prove the second and fourth prongs. Defendant contends that Plaintiff was not meeting its expectations as an employee. Even if the Court finds there is a genuine issue of fact as to whether Plaintiff was meeting the Defendant's expectations in the Rotary Cam department, Plaintiff has failed to prove the circumstances gave rise to an inference of discrimination.

Plaintiff first argues that Nathan Reichel, her white male partner while in the Rotary Cam department, was treated more favorably than her. She points out that Reichel was not terminated when he violated the same company policies that Plaintiff allegedly violated. Reichel is similarly situated to Plaintiff in that he performs the same duties as Plaintiff and has the same job title. However, there is no evidence that Reichel violated company policies successively over a short period of time. Reichel, who had worked for Remington for approximately ten years longer than Plaintiff, testified that in the past he had been given a formal write up for failing to keep his rings segregated for recycling. (Reichel Dep., Dkt. No. 30 at p. 43, 31:12-24). Segregating the rings was not Reichel's responsibility on October 12th. (Yekel Dep., Dkt. No. 30 at p. 120, 58:12-16). Further, Yekel testified that he had previously counseled Plaintiff about mixing the rings and he did not write her up for her first offense. *Id.* at p. 123, 61:10-18. Yekel testified that Plaintiff took 100 percent of the responsibility for the colored rings incident on October 12th because she was working in the ring room that day and Reichel was not. (Yekel Dep., Dkt. No. 30 at p.109,

47:4-48:1; p. 120, 58:12-16). Yekel was going to write both Plaintiff and Reichel up for the violation, but Plaintiff took responsibility. *Id.* The fact that Plaintiff was disciplined for the rings and Reichert was not, does not suggest racial or gender discrimination.

Next, Plaintiff contends that she was required to attend shift change meetings in the supervisor's office while her co-workers in Rotary Cam were not. However, Plaintiff stated in her deposition that Luke, Floyd, John, Chris, and Reichel had to do shift change meetings in the supervisor's office. (Pl. Dep., Dkt. No. 30 at p. 251, 84:15-16).

Further, the Defendant has provided a legitimate reason for Plaintiff's termination: failure to follow procedure on at least three occasions and aggressive behavior toward a supervisor. Plaintiff argues that a reasonable jury could find the Defendant's stated reasons for her termination to be pretextual. Plaintiff again points to the Defendant's unequal discipline of Nathan Reichel and other co-workers. As stated, the Court finds that Reichel's actions were not comparable to Plaintiff's and the co-workers were required to attend the same meetings as Plaintiff. Therefore, these arguments do not support pretext.

In addition, Plaintiff claims that supervisors did not follow policy when investigating her complaints about her co-workers turning off her machines, falsely claiming she was late for her shift, and sabotaging her handmade tool. Yekel investigated Plaintiff's complaint about her machine being turned off and false complaints regarding when she arrived for her shift. (Yekel Dep., Dkt. No. 30 at p. 71-72, 9:14-10:1). He spoke to the employees who turned off Plaintiff's machine and to Reichel. The previous shift employees told Yekel that Plaintiff was not present at shift change. *Id.* Plaintiff admitted in her deposition that this problem occurred when Reichel was absent. (Pl. Dep., Dkt. 30 at p. 202, 35:4-9). The previous shift would not wait on Plaintiff to arrive at her workstation for the shift change meeting. *Id.* Reichel testified that he came to work

8

ten minutes before Plaintiff because he had childcare issues and needed to leave ten minutes early from his shift. (Reichel Dep., Dkt. No. 30 at p. 22, 10:3-11). Reichel admitted that when he worked alone and didn't make it to his workstation in time, the machines were also turned off. He stated that this was done for safety reasons. *Id.* at p. 14-15, 14:23-15:10.

There is no evidence in the record of an investigation regarding plaintiff's handmade tool being thrown away. Yekel testified that Plaintiff told him about a "punch" she had fabricated. (Yekel Dep., Dkt. No. 30 at p. 87-88, 25:7-26:1). He advised Plaintiff that it was against policy to manipulate tooling because it could ruin equipment and components. *Id.* He told her that she should address it with support staff such as engineers or maintenance to make sure the tool was up to specifications. *Id.*

After talking to Plaintiff, Reichel, and the previous shift employees, Yekel found no evidence that the co-workers were harassing Plaintiff. (Yekel Dep., Dkt. No. 30 at p. 114, 52:17-22). To ensure effective communication between shifts and Plaintiff's timeliness, he required all Rotary Cam employees to report to the supervisor's office for shift change meetings. Plaintiff claims Yekel's investigation violated the corporate policy because he did not involve the Human Resources Department. However, Yekel testified that he spoke to Beth Ellis in HR about Plaintiff's complaints and asked for guidance multiple times. *Id.* at p. 115, 53:4-11. The Court finds that there is insufficient evidence for a reasonable jury to infer pretext based on the investigation, or lack of investigation, of Plaintiff's complaints. "An employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009) (internal quotations omitted).

Next, Plaintiff argues that the Yekel failed to follow his discipline policy by terminating her instead of suspending her. It is undisputed that Yekel stated he generally has a "three strike" approach to discipline. When asked why Plaintiff wasn't given suspension instead of termination, Yekel responded that there were too many incidents with Plaintiff in a short amount of time. *Id.* at p. 101, 39:9-13. There is no evidence in the record that Remington had a discipline policy requiring suspension before termination. Further, violation of the Defendant's policy, alone, does not support a finding that Plaintiff was fired on account of her sex or race.

The Court concludes that Plaintiff's evidence does not raise a reasonable inference that unlawful sex or race discrimination motivated her termination or that the Defendant's reason for her termination was pretext. The Eighth Circuit has noted that "The critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough*, 559 F.3d at 861–62 (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004); *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000). Plaintiff has failed to show that the Defendant acted based on an intent to discriminate rather than on a good-faith belief that Plaintiff committed misconduct justifying termination. Defendant's motion for summary judgment of Plaintiff's race and sex discrimination claims under Title VII and ACRA is granted.

B. <u>Hostile Work Environment</u>

To establish a claim of hostile work environment, a plaintiff must show (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon race or sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment and failed to

10

take proper remedial action. *Ross v. Douglas County*, 234 F.3d 391, 395–96 (8th Cir. 2000). The underlying wrongful conduct "must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 910 (8th Cir. 2006) (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)). Whether an environment is hostile or abusive "can be determined by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. at 23. These circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Not all unpleasant conditions in the workplace create a hostile work environment.

The Court finds that the alleged harassment of which Plaintiff complained was not sufficiently hostile or abusive to support a claim of hostile work environment under Title VII or ACRA. Moreover, Plaintiff has been unable to provide any evidence, beyond her own speculation, that her alleged mistreatment was due to her protected status.

    C.  Retaliation

"Title VII makes it unlawful for an employer to discriminate against an employee for engaging in protected action such as making a racial harassment complaint." *Green*, 459 F.3d at 913-14 (citing 42 U.S.C. § 2000e–3(a)). "To prove a retaliation claim, a plaintiff must show (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Id.* (quoting *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005)).

Plaintiff alleges she engaged in protecting activity by sending an email on

April 8, 2023 complaining about her co-workers' conduct toward her. However, Plaintiff admits that her supervisors did not receive her email and there is no evidence in the record to prove otherwise. Plaintiff also alleges that she engaged in protected conduct when she told Yekel and Beaman that she felt her co-workers were being racist when they threw away her handmade guiding tool. These discussions took place in or before April of 2023.

Plaintiff was written up on April 12, 2023 for sleeping on the job on April 7, 2023. (Yekel Dep., 30 at p. 90, 28:3-7). Plaintiff did not receive another write-up until October 12, 2023, six months later. The following day she received another write-up which ultimately led to her termination on October 20, 2023. Plaintiff argues that she "got several more" write-ups during this six-month period which support her retaliation claim. It is undisputed that Yekel disregarded at least three writeups on Plaintiff regarding the time clock and one writeup for machine smashing. (Pl. Dep., Dkt. No. 14-4 at 171:20-25-172:1-12). The Court disagrees with Plaintiff's assessment of the evidence. The fact that Yekel did not take every opportunity to discipline Plaintiff during the six months following her protected activity tends to show that there is no causal connection between her termination and the protected activity.

Further, the Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff. Plaintiff has been unable to point to any significant evidence to support a pretext argument beyond temporal proximity of her complaint and her termination. The Eighth Circuit has held that termination shortly after protected activity is not enough, standing alone, to raise a genuine issue of material fact as to the causal connection prong of a prima facie claim. *Green*, 459 F.3d at 915. A six-month gap between the adverse action and the protected activity is not close enough under these facts.

IV. Conclusion

For these reasons, Defendant's motion for summary judgment (Dkt. No. 12) is GRANTED. The Clerk is directed to close the case.

IT IS SO ORDERED this 11th day of September, 2025.

_____
James M. Moody Jr.
United States District Judge